**HALSTED et al. v. SECURITIES & EX-
CHANGE COMMISSION.**

No. 10289.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 10, 1950.

Decided April 24, 1950.

Messrs. Charles B. McGroddy, Jr., and Lynne A. Warren, New York City, of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, for petitioners.

Messrs. Franklin C. Salisbury and Harold G. Aron, Washington, D. C., also entered appearances for petitioners.

Mr. Roger S. Foster, General Counsel, Securities & Exchange Commission, Washington, D. C., with whom Mr. Aaron Levy, attorney, Securities & Exchange Commission, Washington, D. C., was on the brief, for respondent.

Mr. Louis Loss, Washington, D. 'C., also entered an appearance for respondent.

Before EDGERTON, WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This case presents the question whether the Securities & Exchange Commission has power to prohibit a stockholders' protective committee from soliciting financial contributions from the stockholders whom it represents in a reorganization proceeding under the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., where such contributions were to be used for the purpose of bearing the expenses of the committee and paying fees to its legal and other representatives.

The Long Island Lighting Company is a utility holding company, incorporated under the laws of New York. In 1936 the Securities & Exchange Commission granted the company an exemption from the provisions of the Public Utility Holding Company Act, pursuant to section 3(a) (1) of that Act. On April 21, 1945, after appropriate. proceedings, Long Island's exemption was revoked by the Securities & Exchange 'Commission, and Long Island thereupon registered as a holding company. In November 1945 proceedings under section 11(b) (2) and 11(e) of the Act were commenced and consolidated. Hearings were held from time to time in these proceedings. Early in 1948, petitioners J. Donald Halsted, E. M. Nichols and B. F. Grizzle formed a protective committee for common stockholders of Long Island. From that point on the committee was represented before the Commission, and from time to time offered objections to various actions taken or proposed by the Commission in the 11(e) and 11(b) (2) proceedings. On November 2, 1949, the Securities & Exchange Commission concluded that a plan submitted under 11(e), if modified in certain aspects, would be fair and equitable, and upon that modification the plan was approved on November 17, 1949. The common stockholders' committee offered certain objections to this plan, none of which are here relevant. The plan has lately (February 10, 1950) been approved by the District Court for the Eastern District of New York as being proper, fair and equitable.

The protective committee, petitioners here, filed a declaration of solicitation with

the Securities & Exchange Commission on April 21, 1948, requesting permission to circularize the common stockholders and secure authorization to represent them in certain aspects of the reorganization. This was approved by the Securities & Exchange Commission on June 10, 1948. On October 28, 1948, the committee requested the Commission to approve the circularization of the stockholders for a voluntary contribution of 5 cents a share. After a hearing on the proposed solicitation, the Securities & Exchange Commission, on March 31, 1949, issued an order denying the permission requested, and the protective committee brings this appeal.

The committee contends, in its petition to this court: First, that the Securities & Exchange Commission has no jurisdiction to regulate or prohibit the circularization of stockholders for the purpose of acquiring funds to finance the committee; second, that the action taken by the Commission violates the committee's right of free speech under the First Amendment; and, third, that in any event the Commission's action was arbitrary and capricious. A further contention was made for petitioners, in their brief and oral argument, that the Long Island Lighting Company neither operates in, affects, nor burdens interstate commerce, and that hence the Securities & Exchange Commission has no jurisdiction over the company and consequently no power to regulate the activities of the committee.

The first question is thus whether the Securities & Exchange Commission had authority under the Public Utility Holding Company Act of 1935 to deny the committee the permission which it requested to circularize the stockholders of the company. The principal statutory provision which must be examined is section 12(e) of the Holding Company Act, reading as follows: "It shall be unlawful for any person to solicit or to permit the use of his or its name to solicit, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, any proxy, power of attorney, consent, or authorization regarding any security of a registered holding company or a subsidiary company thereof in contravention of such rules and regulations or orders as the Commission deems necessary or appropriate in the public interest or for the protection of investors or consumers or to prevent the circumvention of the provisions of this chapter or the rules, regulations, or orders thereunder." 15 U.S.C.A. § 79l(e).

The provision just quoted is an important part of a comprehensive congressional plan for the regulation of public utility holding companies. Prior events had shown the necessity for supervision of these companies, and in particular the need for reorganization of their capital structure. See American Power & Light Co. v. Securities & Exchange Commission, 329 U.S. 90, 96–104, 67 S.Ct. 133, 91 L.Ed. 103; In Re Standard Power & Light Corp., D.C., 48 F.Supp. 716, 719–720. Under the Holding Company Act an expert administrative body, the Securities & Exchange Commission, was given broad regulatory powers over registered companies, to compel reorganization when necessary, and then to control the reorganization process. And solicitation of authorizations, especially of the right to act for security holders, was among the practices which for the protection of investors Congress considered it necessary to control, both during the ordinary operations of a registered company and during the reorganization process. The Securities & Exchange Commission had previously, in the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., been given power to supervise communications addressed to holders of securities registered under that Act, where proxies and similar authorizations were being solicited. Section 14(a) 1934 Act, 15 U.S.C.A. § 78n(a). In the Public Holding Company Act of 1935, passed a year later, the Congress gave the Commission broader powers over proxy solicitations than it had given in the 1934 Act. Section 12(e), 1935 Act, 15 U.S.C.A. § 79l(e). In this, as in other instances, Congress showed that it deemed the public utility holding company field to be one requiring a stricter measure of regulation and control than was the case with corporations generally. Both the 1934 and 1935 Acts applied to solicitations of "any proxy, power of attorney, consent, or authorization." But the 1935 Act in section 12(e)

not only permits the Commission to make rules and regulations for the control of such solicitations, but also to regulate by order solicitations not falling within the ambit of any particular rule. Further, in section 12(e) the Commission was specifically empowered to prevent circumvention of the provisions of the Act and of the Commission's implementation of those provisions. The 1935 Act thus authorized not only prohibition by the Commission of solicitations obviously contrary to the Act, but also regulation of those fashioned in a more ambiguous design, aimed at avoiding the Act by circuitous means. The employment of legal expertise in sleight-of-hand was not unknown in the utility holding company field. The Congress recognized that it was necessary to give the Commission broad powers in order that the adroit manipulation which had resulted in the abuses of the holding company system could be prevented. Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 1942, 119 F.2d 730, 738–739, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497.

Prior to the passage of the 1935 Act, protective committees frequently required their constituent security holders to sign agreements, under which their securities were physically deposited with the committee. These agreements commonly gave authority to the committee not only to act for the security holders, but also to obtain for the committee, through hypothecation and otherwise, such measure of reimbursement and compensation as the committee might see fit to require. Assessments were also utilized from time to time by protective committees to raise from their constituents funds for the conduct of the committee's business and, in some instances at least, for payment of compensation. It has been pointed out that under deposit agreements assessments were on occasion used as a device for retention of control, and that under such agreements "Assessments have been levied apparently more with reference to their deterrent effect upon withdrawal than with reference to the actual expenses which the committee has incurred. * * * Committees have levied assessments which have amounted to a substantial percentage of the market price of the securities, and, in fact, as much as the entire amount of the market price, thus making withdrawal impractical if not completely useless." [1] And one of the notorious abuses of the past consisted in excessive fees obtained by committees when left to their own discretion, as well as costs incommensurate with services rendered either to the security holders or the corporation being reorganized.[2]

In contrast, the Commission's regulations now provide, in substance, that any person represented by a protective committee may sever his connection with the committee at any time prior to the close of the proceeding, without expense to him. Rule U–62(h). Further, the Holding Company Act, in section 11(f), expressly gives the Commission control over all fees and expenses in connection with reorganization proceedings under the Act, in the following broad language: "The Commission may, by such rules and regulations or order as it may deem necessary or appropriate in the public interest or for the protection of investors or consumers, require that any or all fees, expenses, and remuneration, to whomsoever paid, in connection with any reorganization, dissolution, liquidation, bankruptcy, or receivership of a registered holding company or subsidiary company thereof, in any such proceeding, shall be subject to approval by the Commission." 15 U.S.C.A. § 79k(f).

1. Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Pt. I, p. 889 (1937), prepared by the SEC pursuant to section 211 of the Securities Exchange Act of 1934, 48 Stat. 909.

2. Ibid, Pt. I, pp. 642-60; pp. 211-42; Pt. II, pp. 351-73. "Honest and economical representation of security holders may be defeated by reason of the absence of control over the fees which committee members receive." (Pt. II at 351-52)

In the light of these provisions and their history, we think the Commission was correct in finding that the proposed action in circularizing stockholders amounted to soliciting an "authorization" within the meaning of section 12(e), and that it would or could produce "circumvention of the provisions of this chapter or the rules, regulations, or orders thereunder" within the meaning of the same section. To construe the provisions of section 12(e) as covering only the solicitation of "any proxy, power of attorney, consent, or authorization" in *haec verba* would defeat the patent congressional intent to give the Securities & Exchange Commission a needed measure of control over the relationships between stockholders and persons who seek to represent them in reorganization proceedings. Securities & Exchange Commission v. Okin, 2 Cir., 1943, 132 F.2d 784. It cannot be questioned that a contribution of funds could well make any prior right of representation more potent and effective. But more important, from the standpoint of investor protection, is the fact that it binds the shareholder to the committee to which he has contributed, and undermines the controls which Congress intended the Commission to exercise over committee compensation.

The Commission, in an opinion accompanying the order here in question, discussed the impact of the statute on the activities of protective committees. It said, in part:

"In examining proposals respecting activities of protective committees in connection with proceedings before us, we are mindful, on the one hand, that there is an area for beneficial class representation by such committees which should be preserved and, on the other, that committee activities have been the subject of abuses in the past and must be regulated in the interests of protecting the security holders represented and preventing undue burdening of the reorganization process.

"We have provided procedures for the effective participation of committees in proceedings before us on behalf of the security holders they represent. The committees are aided through the enforcement, under proper circumstances, of the management's obligation to provide them with stockholders lists, the granting of permission to participate actively in the proceedings before us and to explore pertinent matters and present their views, and the granting of allowances for fees and expenses to committees who have contributed to the reorganization through their assistance in the exploration and resolution of the issues.

"This recognition of committees has afforded an incentive to beneficial committee participation which, in our opinion, has not been reduced by requiring that compensation await the determination of the extent of the contribution to the reorganization. Our usual procedure is to pass upon requests for allowances at a time when the services of all the representatives of security holders have been substantially completed and can be evaluated in the light of the results they have achieved. This procedure is adapted to the nature of the reorganization process and is justified in the light of the assurance of adequate compensation for constructive services that our jurisdiction to award compensation out of the reorganization estate affords. Moreover, we believe it is a salutary requirement tending to limit security holder representatives to activities which are constructive in nature."

To these observations of the Commission, we may add that in our view the Commission's order in this case does not impose an undue restriction on the committee's power to represent its constituents effectively. Certainly it has received no different treatment from other similar committees functioning in proceedings before the Securities & Exchange Commission.[3] Nor is there any indication that its activities have in fact been limited by reason of the Commission's order. In a proceeding in the Eastern District of New York con-

---

3. Only one previous instance of allowing solicitations for contributions has been cited to us. In the Matter of George B. Bassett, et al., File No. 68-13. This was in 1942, prior to the establishment of the Commission's present procedures.

cerning the reorganization of Long Island, Judge Kennedy recently referred to a contention along this line made before him by the protective committee here involved, and said:[4] "On that point I can only say that the protective committee was represented before me by competent counsel who presented in great detail and with entire clarity their opposition to the plan. Their reply brief, which was printed, presents their contentions in racy and incisive style. But more than that, the brief and indeed counsel's whole presentation show that they are armed with full details concerning the history and structure of the company. It is difficult for me to conceive how preparation could be more complete or presentation more vigorous even if each common stockholder had paid five cents per share. I find nothing in the record showing that the representation of the common stock before the federal commission was stifled, or was in any way weakened by the commission's action. Its counsel were as vigorous and competent as they were before me."

What is really in issue in this case is not representation; it is fees. True it is that the extent and quality of representation may be intimately related to the size of the representative's fee. But we cannot conclude from this that every group in a reorganization must be allowed unlimited fees. Protection of investors requires a different standard, and Congress has so decreed. The express provisions of section 11(f), quoted above, give the Commission direct control over the fees to be allowed in enumerated proceedings under the Act. We cannot ignore this provision, or invite its evasion. Under a closely comparable provision of the Chandler Act,[5] the Supreme Court has recently declared that investors are entitled to full protection, even as against their own contractual arrangements.

Leiman v. Guttman, 336 U.S. 1, 69 S.Ct. 371, 93 L.Ed. 453. There a protective committee had sought to enforce in a state court an agreement made between it and four stockholders, providing that certain stock should be held in escrow and paid as a fee. The Supreme Court held that the bankruptcy court had exclusive jurisdiction under the Chandler Act to fix committee compensation, whatever its source. Mr. Justice Douglas, speaking for the Court, said: "A statute establishing such broad supervision over committees cannot be presumed to be niggardly in its grant of authority when it deals with the matter which of all the others has the most direct impact on those whom it aims to protect. * * * The statute was designed to police the return which all security holders obtain from reorganization plans. The net return cannot be kept under supervision if private arrangements expressed in escrow agreements are to control. For the impact of excessive fee claims is the same whether they are charged directly against the estate or against the claim which represents a proportionate interest in the estate." 336 U.S. at page 8, 69 S.Ct. at page 374, 93 L.Ed. 453.

The last sentence quoted reflects the important fact that the payment of fees to fiduciaries, whether or not from the trust estate, fixes the amount receivable by the ultimate party in interest—the beneficiary. Justice Douglas points out that in the past fiduciaries usually fixed their own fees in reorganization proceedings, and that as a result "the effective amount received by creditors and stockholders under the plan was determined not by the court but by reorganization managers and committees." 336 U.S. at page 7, 69 S.Ct. at page 374, 93 L.Ed. 453. That is the heart of the matter. The Commission's power of ultimate

4. Opinion dated February 10, 1950.

5. Section 221 of Ch. X of the Bankruptcy Act, 52 Stat. 897, 11 U.S.C.A. § 621, provides:
 "The judge shall confirm a plan if satisfied that * * *
 "(4) all payments made or promised by the debtor or by a corporation issuing securities or acquiring property under the plan or by any other person, for services and for costs and expenses in, or in connection with, the proceeding or in connection with the plan and incident to the reorganization, have been fully disclosed to the judge and are reasonable or, if to be fixed after confirmation of the plan, will be subject to the approval of the judge * * *."

control over fees under section 11(f) would be of little worth or significance if a court were to compel the Commission at the present stage of the case to permit the type of activity here contemplated. The Holding Company Act, like the Chandler Act, cannot be presumed to be "niggardly in its grant of authority", when coping with the problem here presented.[6] Under the plain words of section 11(f), that provision applies to "all fees, expenses, and remuneration, to whomsoever paid, in connection with" a court reorganization proceeding.

The reorganization of Long Island has been subject to a court proceeding, as is the case with almost all holding company reorganizations. Beyond question the coverage of section 11(f) includes fees payable in the court proceeding from company funds, and it is from those funds (and solely from those funds) that the committee here involved has announced it will ultimately seek its compensation. The contributions it presently desires to solicit were to be merely a temporary measure of relief, until determination is made under section 11(f); a refund would then be made of the

contributions received from stockholders.[7] The practical difficulties created by this proposal to anticipate the Commission's final determination can be readily imagined; sellers in the open market and persons desiring to withdraw from representation by the committee would be in a continued state of doubt as to the extent of the "right" of refund, whether it possessed any immediate value, and to whom it belonged. And the Commission's opinion has the following to say: "The present proposal suggests a deviation from the usual procedure as to fees which we cannot approve. Proposals to solicit contributions involve either the possibility that the soliciting committee and its counsel might retain sums received from the fund in excess of amounts subsequently allowed by us in the reorganization (thus carrying with it possible circumvention of our supervisory jurisdiction over fees and expenses and of the 'fair and equitable' standard of Section 11(e)) or the possibility of substantial complexities and difficulties in effectuating and enforcing fair and equitable provisions for return of contributed sums."

6. In Leiman v. Guttman, the Court said: "Here we are dealing with fees which are incident to the reorganization but not payable out of the estate. Under the less comprehensive language of § 77B [11 U.S.C.A. § 207] the leading authority was that the bankruptcy court had jurisdiction over the latter claims as well. In re McCrory Stores Corp., 2 Cir., 91 F.2d 947. We would be unmindful of history and heedless of statutory language if we held that the power of the bankruptcy court in this respect had been contracted as a result of Ch. X." (Footnote omitted.) (pp. 4–5)

7. The petitioners here submitted to the Commission a proposed letter to the stockholders whom they represented, requesting the 5 cent contribution, which said in part:

"Under the Holding Company Act, the Securities and Exchange Commission has jurisdiction to pass upon the reasonableness of fees and expenses to be paid by the reorganized company to committee members, their counsel and other experts. At the appropriate time, we shall apply to the Commission to have the compensation and expenses of the Committee,

its counsel and experts allowed by the Commission, and paid by Long Island.

"Upon payment By Long Island, the Committee, its counsel, or experts, of their fees and expenses allowed by the Securities and Exchange Commission, each of them, respectively, will use these funds to repay the defense fund for the amounts it shall have paid to the Committee, its counsel and experts, respectively. After the defense fund has received these repayments it will repay, pro rata, the stockholders who contributed to it." (Jt.App. 44)

The Commission, in its opinion in the case, added: "Although the post-effective amendment and its accompanying material did not contain any provision covering the eventuality that the amounts paid out of the fund for fees and expenses might exceed those allowed by us, counsel for the Committee stated in their brief and at argument that the Committee and its counsel and experts would be willing to stipulate that if they received any such overpayments from the fund they would repay to it the amount of such overpayments in addition to any amounts received by them from Long Island pursuant to a grant of allowance by us." (Jt.App. 100–101)

■ The jurisdiction of the Securities & Exchange Commission over fees under section 11(f) is vital to the proper conduct of proceedings such as the present. In re Electric Bond & Share Co.[8] The Commission could properly find that jurisdiction to be threatened with defeat by the proposed solicitation. It is a power which deserves protection from evasion and circumvention to as great a degree as the authority of the District Court under the Chandler Act. And we may note that the Leiman case dealt with a contract made with a committee by a few "individual stockholders, presumably mentally competent adults,"[9] yet that contract was held to be subject to the beneficial controls established by the Chandler Act. Here we have no such bargained contract, but an attempt (in effect) to solicit a like reward by mass circularization of scattered investors. We believe that under section 12(e) the Commission had power to deny the permission requested and that its action should not be disturbed.[10]

That the Commission might have chosen some mechanism to protect the stockholders, other than the method selected, is irrelevant. In American Power & Light Co. v. Securities & Exchange Commission, 1946, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103, Mr. Justice Murphy, speaking for the Court, said: "It is a fundamental principle, however, that where 'Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.' * * * In dealing with the complex problem of adjusting holding company systems in accordance with the legislative standards, the Commission here has accumulated experience and knowledge which no court can hope to attain. Its judgment is entitled to the greatest weight, while recognizing that the Commission's discretion must square with its responsibility. Only if the remedy chosen is unwarranted

8. D.C., 80 F.Supp. 795. In that case the question was raised as to whether the Securities & Exchange Commission had exclusive jurisdiction over the claim for a fee made by an attorney for a stockholder of one of the companies involved in the reorganization. The court held such jurisdiction to exist and to be exclusive, and said in part: "Section 11(e) gives to the SEC the duty to determine in the first instance whether a plan is fair and equitable. It must so find before there can be any court enforcement. I agree with the SEC that jurisdiction over fees is an inseparable part of the determination of whether a plan is fair and equitable. Counsel fees are necessarily awarded after the approval of a plan. If the SEC has no power over fees, it may well approve a plan which in the end is not in its judgment fair and equitable, because of the distribution of fees authorized by other jurisdictions." 80 F.Supp. at page 798.

See, also, the opinion of the Commission in the instant case, quoted supra, where the Commission points out that the usual procedure is to apply for compensation when the services have been completed, compensation which the Commission may award out of the reorganization estate. In re Electric Bond & Share Co., supra, is an instance of such procedure being sustained by the courts.

See, also, In re United Gas Corporation, D.C., 58 F.Supp. 501, 519, affirmed 3 Cir., 162 F.2d 409; 6 Collier, Bankruptcy, pp. 4491–94, 4505–13, 4532–42, and especially 4547–52 (14th ed. 1949).

9. 336 U.S. at page 15, 69 S.Ct. at page 377, 93 L.Ed. 453 (Mr. Justice Jackson, dissenting).

10. The Commission's authority is also buttressed by section 20(a) of the Holding Company Act, 15 U.S.C.A. § 79t empowering the Commission "to make * * such rules and regulations and such orders as it may deem necessary or appropriate to carry out the provisions of this chapter * * *." 15 U.S.C.A. § 79t(a); emphasis supplied. The Commission here was asked to approve a particular circularization of stockholders. It had the power to deal with the problem by special order, "entered after a due consideration of the particular facts in light of the relevant and proper standards. That was true regardless of whether those standards previously had been spelled out in a general rule or regulation. * * * The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. The wisdom of the principle adopted is none of our concern." Securities and Exchange Commission v. Chenery Corp., 332

in law or is without justification in fact should a court attempt to intervene in the matter. Neither ground of intervention is present in this instance." 329 U.S. at page 112, 67 S.Ct. at page 146, 91 L.Ed. 103.

It is thus useless to argue that the Commission might perhaps have devised some plan for permitting the solicitation which would, at the same time, insure a fair degree of compliance with the rules developed by the Commission under the Holding Company Act. The Commission cannot be compelled to pick and choose among devices so long as its action is neither arbitrary nor capricious. There was no arbitrary or capricious action in this case. Far stronger action has been taken on occasion by the Federal courts, in respect of protective committees, in reorganization proceedings under sections 77A and 77B of the Bankruptcy Act, 11 U.S.C.A. §§ 206, 207. In re Schroeder Hotel Co., 7 Cir., 86 F.2d 491 (committee enjoined from communicating with bondholders); In re Madison Hotel Corp., 2 Cir., 89 F.2d 1014 (affirming similar injunction; see 46 Yale L.J. 1391, 1392). And we may note that the committee in this case remains free to make financial arrangements with a limited number (not exceeding 25) of its principal constituents, at arm's length. Rule U-62(b). What is denied is the privilege of mass solicitation of the stockholders—a privilege holding obvious danger to the uninformed investor.

■ There is substantial basis for the Commission's conclusion that protection of investors would be thwarted if solicitations such as those involved in the instant case were permitted. That being so, the ultimate wisdom of the policy adopted by the Securities & Exchange Commission is not for the consideration of this court. The policy may in fact prove to be unwise. Wise or unwise, it was within the Commission's powers. Correction, if correction is needed, should in such case come from Congress or from the Commission itself.[11]

■ Petitioners also contend that the Commission's order violates their right of free speech under the First Amendment. We think that contention without merit. The First Amendment was designed to aid and support the existence of a democratic society by preserving, free from interference, an unlimited market place for the interchange of ideas. See the dissent of Mr. Justice Holmes in Abrams v. United States, 250 U.S. 616, 624, 630, 40 S.Ct. 17, 63 L.Ed. 1173; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. But dissemination of ideas is not involved in the instant case. The Securities & Exchange Commission has not endeavored to control the text of the recommendations of the protective committee to the stockholders, or to prevent them from discussing the merits of the proposed reorganization. The effort is rather to prevent the committee from collecting its fees in a particular manner. As such, the Commission's action is similar to the controls customarily exercised by courts over fiduciaries, and is no more repugnant to the First Amendment than any similar court order in regard to the fees of a fiduciary. In re Schroeder Hotel Co., 7 Cir., 86 F.2d 491, 494; Note, 46 Yale L.J. 1391; 50 Harv.L.Rev. 831; Dealtry v. Posse School, Inc., 1 Cir., 100 F.2d 470; In re George F. Nord Building Corp., 7 Cir., 129 F.2d 173, certiorari denied 317 U.S. 670, 63 S.Ct. 75, 87 L.Ed. 538. Were the committee engaged in forwarding a religious, political, or social cause by soliciting funds from proselytes or from the public generally, its case for freedom from supervision and restraint would indeed be strong. Cf. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Thomas v. Collins, supra; Hague v. C. I. O., 307 U.S. 496, 59

U.S. 194, 201, 207, 67 S.Ct. 1575, 1580, 1760, 91 L.Ed. 1995.

11. See Securities Exchange Commission v. Chenery Corp., 332 U.S. 194, 207–208, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; National Broadcasting Co. v. United States, 319 U.S. 190, at pages 224–25, 63 S.Ct. 997, 87 L.Ed. 1344; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 141–46, 60 S.Ct. 437, 84 L.Ed. 656.

S.Ct. 954, 83 L.Ed. 1423. But petitioners here are engaged in the market place of affairs rather than ideas;[12] they are, like others similarly situated, subject to valid "regulatory legislation affecting ordinary commercial transactions." [13]

We now consider another issue, not raised in the petition, but presented to us by the committee in its brief and oral argument. Petitioners contend that the Securities & Exchange Commission has no jurisdiction over their proposed circularization of the stockholders for the 5 cent contribution because the Securities & Exchange Commission has no jurisdiction over the Long Island Lighting Company. It is alleged that the Long Island Lighting Company is not engaged in interstate commerce and does not affect or burden interstate commerce.

Section 24(a) of the Holding Company Act, under which the petition to this court for review is brought, expressly provides: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do." 15 U.S.C.A. § 79x(a).

 The Commission's order of March 31, 1949, was preceded by (a) a request by the petitioners for permission to circularize the common stockholders, (b) a hearing on this request before an examiner, the transcript of which occupies some thirty pages of record, and (c) the filing of exhibits on behalf of the petitioners. Nowhere among these documents do we find any issue being raised by the petitioners on the question of the general jurisdiction of the Commission, nor does the Commission's order of March 31, 1949, discuss the question. The petition to this court to review the order of the Securities & Exchange Commission contains no suggestion of a contest on the jurisdictional point, and nowhere alleges lack of jurisdiction over the Long Island Lighting Company as such. It is true that on oral argument petitioners claimed, and counsel for the Commission conceded, that petitioners on numerous occasions suggested doubts to the Commission regarding its jurisdiction over the company, and expressed their own belief in the Commission's lack of jurisdiction. But, in view of the full hearing on the proposed circularization and the many opportunities for the committee to question the jurisdiction directly, the maintenance of that general attitude before the Commission cannot avail petitioners here. "The desirability of the provision [§ 24(a)] being so apparent, an appellate court should be assiduous in avoiding review of matters which have not received consideration by the Commission." Phillips v. Securities & Exchange Commission, 2 Cir., 1946, 156 F.2d 606, 608. The question of the Securities & Exchange Commission's jurisdiction over the Long Island Lighting Company, therefore, is not properly before this court and we cannot consider it. American Power & Light Co. v. Securities & Exchange Commission, 1 Cir., 1944, 141 F.2d 606, affirmed, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103; Todd v. Securities & Exchange Commission, 6 Cir., 1943, 137 F.2d 475; Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 1942, 127 F.2d 378; cf. Marshall Field & Co. v. National Labor Relations Board, 1943, 318 U.S. 253, 63

---

12. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262. In Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 176, 64 S.Ct. 438, 88 L.Ed. 645, Mr. Justice Jackson, concurring, spoke of some of the well-known methods of fund-raising employed by religious groups, and said: "All such money-raising activities on a public scale are, I think, Caesar's affairs and may be regulated by the state so long as it does not discriminate against one because he is doing them for a religious purpose, and the regulation is not arbitrary and capricious, in violation of other provisions of the Constitution." 321 U.S. at page 178, 64 S.Ct. at page 445.

13. See Chief Justice Stone's opinion in United States v. Carolene Products Co., 304 U.S. 144, at pages 152–53, 58 S.Ct. 798, 82 L.Ed. 1234; see, also, Murdock v. Pennsylvania, supra, 319 U.S. at pages 110–11, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Kovacs v. Cooper, 336 U. S. 77, 89, 94–96, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608 (Frankfurter, J., concurring).

S.Ct. 585, 87 L.Ed. 744; Saunders Petroleum Co. v. Bowles, Em.App.1945, 152 F.2d 112, 119–120.

We may note that in a recent proceeding before the forum most intimately connected with the reorganization of Long Island, the District Court for the Eastern District of New York, this same stockholders' protective committee contested the Securities & Exchange Commission's jurisdiction over Long Island. The District Court was there considering, pursuant to section 11(e), the propriety of a reoganization plan approved by the Commission, and the question of jurisdiction apparently was timely raised. In its decision, rendered after argument of the instant case before this court had taken place, the District Court held that the Securities & Exchange Commission had jurisdiction over Long Island and that the proposed plan was fair and equitable. Judge Kennedy said, in part: "But in a proceeding related to this one, in the sense that it concerned itself with a subsidiary of Long Island Lighting Company, a jurisdictional objection precisely similar to that here under consideration was urged before me by counsel for the Public Service Commission of the State of New York, In re Kings County Lighting Co., D.C.E.D.N.Y. 1947, 72 F.Supp. 767. The state commission in that case urged that Kings County Lighting Company was not selling heat, light and power in interstate commerce, and that even though the securities of Long Island were being distributed throughout the states, that would not constitutionally support the application to it of an act assuming to override the state's primary interest in corporations generally, and public utility corporations particularly, operating wholly within the state—substantially the argument which the protective committee is urging in the District of Columbia, and urges here.

I mistakenly thought the question important, and gave it rather full consideration. But on appeal, Public Service Commission of New York v. Securities and Exchange Commission, 2 Cir., 1948, 166 F.2d 784, 788, certiorari denied 1948, 334 U.S. 838, 68 S.Ct. 1495 92 L.Ed. 1763, Judge Learned Hand said 'the constitutional question is too trivial to justify discussion'. I realize, of course, that on the surface an attack on the constitutionality of the Act might be entirely different from a mere challenge to the jurisdiction because the Act is said not to be applicable. But here, as in the Kings County Lighting case, they come to the same thing. The argument is that if the Public Utility Holding Company Act is applicable to public utility companies operating wholly intrastate then the basis for federal jurisdiction (interstate commerce) is non-existent and therefore to apply the Act would be [to] violate the constitutional reservation to the states of powers not granted. The answer here, as in the Kings County Lighting case, is that interstate distribution of securities is a sufficient constitutional basis for federal legislation, even passing the point that the companies promulgating the plan here under discussion have voluntarily submitted themselves to the jurisdiction of the federal commission, and the question whether a stockholder is entitled to complain."

We see no reason to disagree with the conclusion reached by Judge Kennedy. Certainly the record before us shows nothing to warrant disagreement. And even if we should take judicial notice of the prior orders entered by the Securities & Exchange Commission, as the committee at oral argument invited us to do, we would find it difficult indeed to conclude from an inspection of those orders that a system of such tremendous size,[14] serving so many

14. In 1943 the Long Island Lighting Company System rendered electrical service to 197,332 customers and gas service to 270,295 customers, among such consumers being many large war plants and military establishments. The System's consolidated assets aggregated over $144,000,000, as of September 30, 1944, and for the twelve months ending that date the consolidated operating revenues, aggre-

gated over $27,000,000. The preferred and common stock of Long Island itself was distributed as of April 15, 1944, among 10,577 public holders of record residing in virtually every state, the District of Columbia, Hawaii, and a number of foreign countries. Its first mortgage bonds totaling over $30,000,000 were held by ten life insurance companies, three of which are located in New York, six

consumers, with securities so widely held, does not affect interstate commerce and thus is without the scope of the Commission's jurisdiction.[15]

Upon examination of the record we find no error. The order of the Securities & Exchange Commission accordingly is

Affirmed.

WILBUR K. MILLER, Circuit Judge (dissenting).

Certain stockholders of the Long Island Lighting Company, a registered public utility holding company involved in a reorganization proceeding before the Securities and Exchange Commission, designated a protective committee to represent their interests before the Commission and the courts. The committee functioned actively and energetically, but when it proposed to solicit from its signatory stockholders voluntary contributions to pay fees and expenses, the Commission prohibited it from doing so. Being convinced that the Commission's prohibitory action exceeded its authority, I cannot concur in the majority decision which upholds it.

Of course the Securities and Exchange Commission cannot forbid a protective committee to solicit operating funds from stockholders whom it represents unless the power to do so has been granted to it by legislation. The majority opinion finds the requisite statutory grant of authority in §§ 12(e) and 11(f) of the Public Utility Holding Company Act, 15 U.S.C.A. §§ 79l(e) and 79k(f). I cannot find it in either section.

The provision more heavily relied on by the court to justify its decision is § 12(e), which makes it unlawful to solicit "any proxy, power of attorney, consent, or authorization regarding any security of a registered holding company" without Commission approval. The majority say that for a stockholders' committee to ask its principals for expense money is to solicit an "authorization" within the meaning of the section. I disagree because it seems plain that the statutory expression "authorization regarding any security of a registered holding company" refers to the general designation of an agent or representative regarding such a security, just as do the companion words "proxy, power of attorney, consent".

If Congress had intended to authorize administrative prohibition against solicitation of voluntary contributions from stockholders by a committee already lawfully designated by them by proxy, power of attorney, consent, or authorization, it could easily have said so. Had it so intended, I am sure Congress would not have been content to describe a voluntary contribution to the expense fund of a lawful agent as a "proxy, power of attorney, consent, or authorization regarding" a security. It would have found and used words or terms more aptly expressive of its intention. So I conclude that § 12(e) of the Act does not support the court's decision.

The other statutory provision which the court thinks authorizes the Commission to forbid the solicitation of expense money by a protective committee is the following portion of § 11(f) of the Act:

in states other than New York, and one in Canada. The securities of Long Island are traded on national security exchanges and as an incident to the wide distribution of the System's securities, Long Island employs the mails in connection with various corporate matters, the servicing of security holders, and the dissemination to the public of operating and financing data (SEC Release No. 5746, dated April 21, 1945)

15. In National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, Chief Justice Hughes, speaking for the Court, said: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." 301 U.S. at page 37, 57 S.Ct. at page 624. And it cannot be seriously contended that Congress, in enacting the Public Utility Holding Company Act of 1935, did not exercise that control.

"* * * The Commission may, by such rules and regulations or order as it may deem necessary or appropriate in the public interest or for the protection of investors or consumers, require that any or all fees, expenses, and remuneration, to whomsoever paid, in connection with any reorganization, dissolution, liquidation, bankruptcy, or receivership of a registered holding company or subsidiary company thereof, in any such proceeding, shall be subject to approval by the Commission."

In the legal proceedings mentioned in the foregoing excerpt, fees and expenses ordinarily are allowed by the court and ordered paid from the estate being administered. The language quoted from the statute simply requires Commission approval before allowance by the court. In my view, the obvious reference of the statute is to official allowances payable out of the funds of the holding company which is being liquidated or adjusted, for the language is "fees, expenses, and remuneration * * * *in any such proceeding*". (Emphasis supplied.) This protective committee had no official role and performed no official function. It merely represented certain individuals in an attempt to protect their personal interests. In such circumstances it would seem that the fees and expenses of the committee could not be allowed and ordered paid out of the funds of the Long Island Lighting Company. That is why § 11(f) does not apply here. It seems immaterial that the committee here involved has announced it will ultimately seek compensation from company funds, in which event the section would apply; it has not done so and that situation is not before us.

No matter how pressingly necessary it may really be for the Commission to have power to prevent protective committees from asking their signatories for expense money, and no matter how much the Commission may desire to have that power, the simple fact is that Congress has not conferred it. Administrative authority, legislatively granted, should not be judicially extended beyond the express terms of the grant.[1] I think the court's opinion violates this principle.

1. Mr. Justice Frankfurter, speaking for the Supreme Court in Addison v. Holly Hill Fruit Products, Inc., 1944, 322 U. S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, 153 A.L.R. 1007, said:

"Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive." See also E. C. Schroeder Co. v. Clifton, 10 Cir., 1946, 153 F.2d 385, 390, certiorari denied 328 U.S. 858, 66 S.Ct. 1351, 90 L.Ed. 1629.