**In re NORTHERN STATES POWER CO. (DELAWARE).**

**In re NORTHERN STATES POWER CO. (MINNESOTA).**

**Civ. No. 2673.**

United States District Court,
D. Minnesota, Fourth Division.

Jan. 12, 1953.

Order Affirmed April 19, 1954.
See 212 F.2d 407.

Myron S. Isaacs and Robert S. Keebler, Washington, D. C., for the Securities and Exchange Commission;

A. Louis Flynn, Chicago, Ill., in his own behalf and also for Northern States Power Co. (Delaware) and its subsidiaries;

G. Aaron Youngquist (of Fowler, Youngquist, Furber, Taney & Johnson), Minneapolis, Minn., in his own behalf with respect to his claim and also for Northern States Power Co. (Minnesota);

Clarence McMillan, New York City, in his own behalf;

Bernard S. Barron, New York City (of Barron, Rice & Rockmore), New York City, in his own behalf;

Robert B. Luick, Boston, Mass. (of Sullivan & Worcester), Boston, Mass., in his own behalf;

Paul D. Miller, New York City, (of Mudge, Stern, Williams & Tucker), of New York City, for Standard Gas & Electric Co.

## 334

NORDBYE, Chief Judge.

This proceeding relates to the allowance of fees and expenses in connection with the dissolution of the Northern States Power Company (Delaware) pursuant to Sections 11(e) and 18(f), Public Utilities Holding Company Act of 1935, 15 U.S.C.A. §§ 79k(e), 79r(f). After the consummation of the plan and the related proceedings affecting the Northern States Power Company (Minnesota), the direct subsidiary of the Delaware Company, all participants were requested to file their claims for fees and expenses with the Securities and Exchange Commission. The total amount requested aggregated approximately $850,000 for fees and $115,000 for expenses. Allowances to be paid by the estate were made between $490,000 and $495,000 for fees and some $103,000 for expenses. Six claimants filed objections challenging the findings of the Commission with respect to their allowances. They are as follows:

A. Louis Flynn, as counsel for the Delaware Company, requested fees of $135,000 in his original petition for services to December 31, 1948, and by a supplemental petition requests fees of $11,000 for services from the latter date to January 31, 1950, and from that date on, a claim for services rendered at the same rate as the services theretofore rendered. He claimed expenses in the sum of $9,725.53 to January 31, 1950. He was allowed a fee of $125,000 as compensation for all services rendered to January 31, 1950, and subsequent thereto, and allowed $9,725.53 for expenses to January 31, 1950, and for any expenses incurred thereafter in connection with the proceedings not to exceed $750.

G. Aaron Youngquist, as counsel for the Minnesota Company, filed a claim for $54,000 for services rendered and $2,338.70 for expenses incurred to January 31, 1950, plus an additional amount for services and expenses thereafter. The Commission allowed him $40,000 for all services rendered to January 31, 1950, and subsequent thereto, and authorized the payment of expenses incurred subsequent to January 31, 1950, in connection with the proceeding in an amount not to exceed $375.

Clarence McMillan, who appeared on behalf of two preferred stockholders and made a one-day appearance in connection with the proceeding, filed a claim for $15,000 for fees and expenses in the total sum of $16. His request for fees and reimbursement of expenses was denied.

Barron, Rice and Rockmore appeared as attorneys for certain Class A common stockholders in the Delaware Company. They claimed a fee of $25,000 for their services and $1,240.77 for expenses. By a supplemental petition they claimed $243.35 additional for expenses. They were allowed $15,000 for fees and $1,240.77 for expenses. The supplemental petition for expenses was denied.

Sullivan and Worcester appeared as attorneys for a stockholder who held 1,100 shares of the Delaware Company Class A common stock. They requested a fee of $30,000 plus expenses. They were allowed a fee of $15,000 and reimbursement of the expenses incurred.

Standard Gas and Electric Company formerly held substantially all of the Class B common stock (729,083 shares of 729,166 shares) and 11,600 shares (3.4 per cent) of the Class A common stock of the Delaware Company. Two law firms and a securities analyst participated in these proceedings in its behalf. The Commission fixed the fees of counsel in the sum of $85,000 plus certain cash disbursements, but ordered that the allowance of the fees and certain of the expenses should not be paid by the Delaware Company, but should be paid by Standard itself. Neither Standard nor its counsel object to the amounts allowed, but challenge the finding of the Commission that the estate should bear no part of its legal services in this proceeding. Standard has paid the fees which were allowed and now seeks reimbursement in this proceeding.

■ This is a so-called Section 11(e) proceeding and there is no specific provision therein which clothes the Commission with jurisdiction to determine and fix fees and expenses in such a proceeding. But it seems reasonably clear that, with the right to determine whether the plan is fair and equitable, there necessarily must be the right to determine whether the fees and expenses incurred in the proceeding are fair and reasonable. Otherwise, an apparently fair and equitable plan, saddled with exorbitant or excessive fees or expenses, might be rendered entirely futile. Indeed, a depreciation of the assets of the reorganized company by excessive fees could well render the plan inequitable and unworkable. Moreover, the Commission's order of January 30, 1948, approving the plan expressly reserved jurisdiction with reference to the determination of fees and expenses to be paid by the estate, and the Court in its enforcement order provided,

"(e) The Delaware Company shall pay or make provision for the payment of such fees and reimbursement of such expenses incurred in connection with the Plan, the transactions incident thereto, and the consummation thereof, as are approved, allocated, or awarded by order or orders of the Commission, and having made such payment or provision and having made the distributions and payments provided for in this paragraph (6), the Delaware Company shall transfer its remaining assets, if any, to the Minnesota Company, without consideration. In the event that the amount of such fees and disbursements approved, allocated, or awarded by such order or orders of the Commission shall exceed the amount of the cash of the Delaware Company available for the payment thereof, the Minnesota Company shall pay such excess."

Considerable support may be found for sustaining the Commission's jurisdiction to determine fees and expenses in an 11(e) proceeding from the entire framework of the Public Utilities Holding Company Act, particularly Section 11(f). See Halsted v. Securities & Exchange Comm., 86 U.S.App.D.C. 352, 182 F.2d 660. But the basic jurisdiction of the Commission herein sufficiently appears from the purposes and objects of an 11(e) proceeding.

■ Probably the more difficult question arises as to the scope of the jurisdiction of the Court in passing upon these objections to the findings of the Commission on the fees to be allowed. Concededly, the Court must recognize and give due weight to the experience and opportunity which the Commission has for fairly appraising applications for fees in such a proceeding. The Commission urges, and this Court recognizes, that where there is substantial evidence to support its findings, and if they were arrived at according to legal standards and are not so arbitrary and unreasonable so as to shock the conscience of the Court, then its decision as to fees should be approved. That the scope of the Court's jurisdiction in reviewing the Commission's findings in an 11(e) proceeding is fairly narrow has recently been settled in Securities & Exchange Comm. v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, subject, however, to the caution as announced in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456, that all conventional judicial functions are not to be abdicated in reviewing orders of an administrative agency.

It may be noted that, before applications for allowance of fees and expenses were lodged with the Commission, the Public Utilities Division suggested to the Delaware and Minnesota companies that they endeavor to reach agreements with the various claimants as to the amount of fees and expenses and then make a recommendation to the Commission as to the amount of fees and expenses which should be allowed. This was done. The claimants, or at least

many of them, conferred with the companies, and after due investigation by the companies, a complete report covering some 85 pages, and with a detailed review of the claimants' services and the companies' recommendation, was submitted to the Commission.

The several objections will be considered in the order referred to above.

A. Louis Flynn.

 Mr. Flynn acted as attorney for the Delaware Company and its subsidiaries throughout this proceeding. His showing indicates that up to January 31, 1950, his office devoted some 6,128 hours to the proceeding, and of that number some 4,739 hours represented his personal time. In justifying its treatment of his claim, the Commission found that an appreciable part of the time spent and services rendered by him was ineffectual in conferring upon the estate or the security holders any benefit. Among other matters, it refers to his alleged unsuccessful efforts in opposing the application for a list of preferred stockholders to the Preferred Stockholders Committee, his unsuccessful opposition to the entry of an order under Section 11(b) (2) of the Act before the Commission and on appeal, his alleged opposition to "certain accounting adjustments", his opposition to the reopening of the record to reconsider the first amended plan, and the alleged duplication of services as between him and Mr. Youngquist, attorney for the Minnesota Company.

At the outset, it must be noted that all of Mr. Flynn's services were performed as counsel for the Delaware Company and that that which he did as counsel apparently carried out the views and policies of his clients. He was not a volunteer in this proceeding, whose services should be strictly appraised by the contributions made to the formation, development and consummation of the plan. Both the Delaware Company and the Minnesota Company recognize that the services related in Mr. Flynn's claim were performed at the request of the respective companies. If some of the services rendered were, in the view of the Commission, unsuccessful steps taken with respect to certain issues raised in the proceeding, Mr. Flynn was nevertheless performing such services at the instance of his clients. Both companies have filed statements in which they approve his fee application. There is no contention or showing by the Commission that the amount claimed by Mr. Flynn is unreasonable in view of the legal services which he actually performed. There is no testimony which contradicts or questions the number of hours devoted to the proceeding or the reasonableness of the hourly rate requested by him. His skill and experience are not controverted. Concededly, the questions involved in this proceeding and affecting these companies were intricate, novel, and required high legal skill. It is not surprising, therefore, that the companies' views and policies in carrying out the apparent purposes and objects of the proceedings did not conform at all times to the Commission's views. To attempt to effect compliance with the Act necessarily presented difficult problems. Whether all of the companies' decisions, therefore, proved to be ultimately right or wrong, they were entitled to legal assistance and advice in doing that which they determined to be compatible and in furtherance of the objects of the proceeding. If legal counsel engaged by these companies, and in carrying out their wishes, are to have their legal fees subjected to the arbitrary rule that, unless the services rendered are ultimately proved to be in furtherance of the policies and plan finally approved by the Commission and the Court they will be disallowed, it would be hazardous indeed for any counsel to accept employment under such circumstances. There is no contention by the Commission that the fees, if allowed as requested and approved by the companies, will affect in any way the fairness or equitableness of the plan, or that the payment will impose any unreasonable financial burden upon

either the companies or their security holders. In the findings and opinion of the Commission, the following comment appears anent Flynn's claim,

"Flynn acted as counsel to the Delaware Company and its subsidiaries throughout the proceedings, advising management with respect to all legal problems, drafting and presenting the various plans filed by the Delaware Company and taking a major part in all matters connected with the evaluation and presentation of such plans and the consummation of the plan finally approved. * * *

"From the commencement of the proceedings Flynn was charged with complete direction and supervision of all legal matters for the Delaware Company. During a substantial part of the proceedings he also acted on behalf of the Minnesota Company. * * *

"Although we recognize, as Flynn has stated, that his opposition at various stages of the proceedings reflected the views of the management, in determining what allowance should be awarded him in these proceedings, consideration must be given to the fact that his activities included unsuccessful opposition to such appropriate steps as the making of the accounting entries and the furnishing of the stockholders' list. While Flynn's services contributed to the formulation, development and consummation of the Section 11(e) plan, his activities were devoted in large measure to supporting plans which proved unsatisfactory, and as a result the laboring oar in carrying through the plan as finally consummated passed from company counsel to various counsel for the common stockholders of the Delaware Company. Such counsel performed considerable services which might otherwise have been performed by company counsel and for which, as we note below, substantial compen-sation is properly allowable out of the reorganization estate."

Although it may be true that some of Mr. Flynn's services were performed in the furtherance of plans and policies which the Commission did not support, and this led to greater activity on the part of counsel for the common stockholders, no one questions the good faith of Mr. Flynn in performing the services which his clients authorized him to perform. Under such circumstances, it would be an anomalous situation if sanction were not given to the contract between the parties. The Commission apparently recognized that in determining the amount of compensation to be paid to counsel for the company which is subject to the 11(e) proceeding, "the services rendered by such counsel for that purpose need not be measured by the results obtained where their proposals are reasonable." If that is the criterion to be applied—the reasonableness of the proposals made—in evaluating Mr. Flynn's services and in determining whether his claim should be approved, the record does not sustain the Commission in its conclusion that his fee should be cut some $21,000 for services rendered to January 31, 1950, and that no allowance should be made for services rendered thereafter. At best, the Commission's action is an arbitrary reduction which it determines at this time based upon its conclusion that, in the retrospect, it appears that some of the efforts of counsel in behalf of its client were not reasonable. Under such circumstances, there is always the tendency to substitute hindsight for foresight.

In a long and involved proceeding of this kind, there is bound to be duplication of some of the services rendered, and some tactical moves which at the time seemed reasonable and for the best interest of the companies involved now may seem ill-advised in light of the events that have taken place. It may not be amiss to point out that the Commission itself spent a great deal of time and effort on the first amended plan.

and later it was required to confess that it erred in its approval. Moreover, it seems quite evident in reading the Commission's opinion that it proceeded to evaluate Mr. Flynn's services substantially in the same way as it would evaluate the services of a volunteer who necessarily must have his remuneration limited to the actual contribution that he made to the formulation and consummation of the plan of reorganization. It seems to the Court that, if one accords due weight to the contract arrangements between attorney and client and recognizes the approval and ratification by the client of the services rendered and gives due weight to the amount of time expended by this applicant and the experience and skill of counsel, the allowance accorded to him by the Commission should not be sustained. The Court is fully cognizant of the weight which generally should be given to the Commission's findings where the appraisal of the value of the attorneys' fees is involved in a reorganization proceeding, and the Court also recognizes that there may be instances where the contract arrangement between the company in reorganization and its attorney should yield to the exigencies of the reorganization which must meet the standards of being fair and equitable. But that situation does not exist here. If the Delaware Company has insufficient funds to pay Mr. Flynn's claim, the Minnesota Company stands ready, willing and able to pay the deficiency. The Court determines herein that, in light of this record, the Commission has failed to give due weight to the contract arrangement between attorney and client and to all the attendant circumstances, and I conclude that the findings of the Commission with respect to Mr. Flynn's fees were not arrived at in accordance with appropriate legal standards. It follows, therefore, that Mr. Flynn should be accorded the fees and expenses which he requests and which his clients have approved.

G. Aaron Youngquist

Mr. Youngquist, as a member of the firm of Messrs. Fowler, Youngquist, Furber, Taney and Johnson, acted as general counsel for the Minnesota Company throughout these entire proceedings. He asks no payment from the Delaware Company. Any remuneration which he receives for legal services will be solely from his client, the Minnesota Company, for which he was acting in attempting to protect its interests and rights so far as they might be affected by the liquidation of the Delaware Company. The services which he performed were at the request of his client. The Minnesota Company, and the Delaware Company as well, are satisfied with Mr. Youngquist's bill and have approved his fees and expenses as requested. That which the Court has stated with respect to Mr. Flynn's claim is particularly apposite here. All of Mr. Youngquist's services were rendered in connection with this proceeding. There is no showing that that which he did was not performed at the behest of his client in good-faith efforts to safeguard and protect its interests in this liquidation and dissolution. The fact that Mr. Youngquist and Mr. Flynn collaborated and that there may be some duplication of effort does not, on this record, and in view of the contract relation between Mr. Youngquist and the Minnesota Company, militate against the reasonableness of the compensation to be allowed him. The Minnesota Company is satisfied that any duplication should not deprive him of the fee requested, and the fact that Mr. Youngquist and his client may have differed with the Commission or the Court with respect to many of the complex issues and questions involved should not affect his right to reasonable compensation. No one questions the reasonableness of the fees for the services actually performed, and obviously they cannot be characterized as being so unreasonable that good conscience requires their denial. As observed in connection with the Flynn claim, the mere fact that certain proposals advanced by the Minnesota Company were

not adopted or may not seem reasonable now, should not deprive counsel of compensation for services rendered at the request of his client. For aught we know now, the so-called advance earnings estimate proposed by Mr. Youngquist for his client, as well as other proposals made by them, may prove to be more sound in the future than that which was adopted by the Commission and approved by the Court. There is not the slightest showing or contention that the payment of Mr. Youngquist's bill will affect in the remotest degree the fairness or equitableness of the plan of reorganization involved herein. The Commission has failed to give due weight to the contract relation between attorney and client, and in view of all the attendant circumstances, its findings and conclusions with respect to Mr. Youngquist's claim cannot be sustained as complying with appropriate legal standards and is not a fair and equitable disposition of this claim. The Court finds that the fees and expenses as requested and approved by the client should be allowed.

Clarence McMillan.

■ As stated, Mr. McMillan represented two preferred stockholders who owned 250 shares of the preferred stock of the Delaware Company. He appeared at the initial hearing on July 8, 1942, and advanced the theory that sound principles in reorganizations under the Bankruptcy Act required that allocations be made on asset value rather than prospective earnings. His oral appearance was very brief and he filed a four-page memorandum to support his views. He never appeared again, nor did he participate in any way thereafter in the hearings or proceedings; in fact, his next appearance was at the fee hearing some seven and one-half years later. He requests a fee of $15,000 and $16 by way of expenses. The Commission found,

"We have carefully reviewed the services of this claimant and have concluded that no contribution resulted from his limited participa-

tion. We cannot find that under the circumstances either his suggestion that the distribution to the preferred stockholders should be based on asset values, or his mere assertion that the plan should provide for payment of accrued dividends out of cash or in the form of additional Minnesota Company stock if cash was not available, was of a nature to constitute a compensable benefit to the estate. The former was without merit and the latter was not substantially different from assertions made to this Commission by a number of other preferred stockholders."

In these views of the Commission, the Court on this record is in complete accord. The objections are overruled and the claim is denied.

Barron, Rice and Rockmore

■ This firm represented some 70 stockholders owning 24,750 shares of Delaware Class A common stock. Their showing in support of their claim for fees indicates that a total of 1,590 hours were devoted to these proceedings, and of that time, 1,380 hours represented time spent by Bernard S. Barron, a senior member of that firm. The fee requested was $37,500. At the request of the Public Utilities Division of the Commission, the company conferred with various counsel who had filed claims for fees and expenses in order to see whether an agreement could be reached as to the amounts to be paid to the various fee claimants. Mr. Barron of this firm complied with this request and made a trip to Minneapolis from New York for that purpose. He presented his claim in person to the representatives of the companies, and after a hearing, they filed a detailed report and recommended a fee of $25,000, which Mr. Barron agreed to accept. The Commission, however, in passing upon this claim, reduced it to $15,000, stating, in part,

"The Barron firm filed objections to the enforcement of the First Amended Plan with the District

Court, contending that the foreseeable earnings of the Minnesota Company were approximately $8,215,000 rather than $6,500,000 as had been estimated by us.[14] Barron together with other counsel supported the Commission's application for a continuance of the enforcement proceedings, and thereafter participated in all the hearings before us and the court, cross-examined witnesses, filed memoranda and briefs, participated in oral argument, and proposed a modification of the Biewend-Johnson Plan, which was one of the alternative plans submitted after the hearings were reconvened. He opposed the Second Amended Plan filed by the Delaware Company but subsequently supported our application for enforcement of the Second Amended Plan, as modified. The record indicates that the services of the Barron firm contributed to the proceedings and the development of the plan as finally approved and to the increased allocation for the Class A stockholders.

"Under all the circumstances, including the duplication of effort referred to above, we think that a fee of $15,000 is reasonable compensation for the services rendered and the contribution made by this claimant."

The Commission also pointed out that there were at least three groups of attorneys for Delaware Class A common stockholders who were allowed an aggregate fee of some $170,000. $140,000 went to the firms representing the so-called Lehman group. Apparently the attorneys for this latter group assumed the laboring oar after Mr. Barron's firm had taken the initiative for the Class A common stockholders in objecting to the approval of the first amended plan. Everyone recognizes that the attorneys for the Lehman group made the most effective and constructive contribution to the formulation and ultimate adoption of the final plan. But, notwithstanding, the record will not justify such a substantial cut in Mr. Barron's claim which the Commission has made upon the basis of duplicitous services. The duplicitous services referred to pertain to the several groups who were representing Class A common stockholders and which were all motivated in obtaining the most favorable allocations for this group. Undoubtedly there was some duplication, which is inevitable in a proceeding of this kind, and the mere fact that duplication exists does not justify such a substantial reduction as was accorded the Barron firm. Moreover, it appears that, when the attorneys for the Lehman group did assume the major task of representing the Class A stockholders, the Barron firm voluntarily reduced its participation in the proceeding accordingly. The relegation of the Barron group to $9.43 an hour is not fairly justified by the record. The Lehman group were accorded an allowance of $24.48 an hour. The disparity between the compensation allowed Mr. Barron and other counsel for Class A stockholders is not consonant with fair and equitable consideration and does not find sufficient support in the record to justify the approval of the Court. True, there is bound to be disparity in the hourly rates accorded to various fee applicants, and the mere existence of such disparity is not sufficient ground for finding that the one accorded a less hourly rate has been treated unfairly. Many other factors must be considered. Attorneys in such proceedings as volunteers may put in a large number of hours but the ultimate contribution to the results may be relatively unsubstantial and their allowances must be appraised accordingly. But, in light of this record, the Court is constrained to find that the contribution of the Barron

14. "The Barron firm joined with the Delaware Company in opposing the application of the Foster Committee for authority to solicit authorizations from the preferred stockholders."

firm cannot in good conscience be approved at $9.43 per hour. Recognizing the weight that should be accorded to the findings of the Commission by reason of its association with these proceedings, nevertheless it should be remembered that this Court by reason of the lengthy hearings on the enforcement of the plan, is also acquainted with much of its background and history and cannot entirely abdicate its prerogatives in reviewing such fee allowances and must determine whether or not the findings of the Commission are consonant, in light of fairness and equity, with the legal standards which should be applied. It is my view that a fee of $23,850 should be allowed this firm for the services performed and the contribution which it has made to these proceedings. This sum is less than the amount approved by the companies and in light of all the circumstances should accord this claimant fair and equitable compensation. It follows, therefore, that the fee of this firm is fixed in the sum of $23,850.

 There is, in addition, the expense item of $243.35, which was allegedly incurred by Mr. Barron in making a trip to Minneapolis at the request of the Commission in order to determine whether the company and this claimant could agree upon the reasonableness of the fees to be paid. It would seem that such expenses were incurred for the purpose of contributing to and aiding the Commission in its problem in passing on the matter of fees. Such expenses should be distinguished from the ordinary expenses which a claimant incurs of his own volition in presenting his claim to the Commission or to the Court for fees and expenses. Here, we have a situation where the expenses which were incurred arose by reason of the request of the Commission, and in carrying out one of the processes adopted by the Commission in the fulfillment of its duty in an 11(e) proceeding. These expenses should be allowed, and it is so ordered.

Sullivan and Worcester

This firm represented Cameron Biewend, who held 1,100 shares of Delaware Class A common stock, and its services began as counsel in February, 1946. The Commission points out that it "thereafter participated actively both before us and the court." Its application for fees indicates that some 1,496 hours were devoted to these proceedings. Fees in the sum of $30,000 were requested. The companies, however, after investigation, recommended a fee of $22,500. The Commission allowed a fee in the sum of $15,000. In passing upon the fees to be allowed this firm, the Commission found that

"Shortly after it was retained by Biewend, Sullivan & Worcester filed with the District Court a statement of objections to the enforcement of the First Amended Plan and filed with us a motion to reconvene hearings to receive new evidence. Biewend, a security analyst, began formulating an alternative plan, and, after the Lehman Plan was submitted to us, he communicated with Christian A. Johnson, who was also interested in the proceedings because of his ownership of Standard's $4 preferred stock, and together they formulated and submitted a plan known as the Biewend-Johnson Plan. At the reconvened hearings both testified in support of this plan and by their testimony attempted to show that the Minnesota Company's annual foreseeable earnings would exceed $8,000,000. This testimony was a contributing factor in inducing us to vacate our order approving the First Amended Plan.

"Sullivan & Worcester, as Biewend's attorneys, rendered efficient and able service. They presented direct evidence through the testimony of Biewend and Johnson, cross-examined other witnesses, filed briefs and presented oral argument. They were partially responsible for the reopening of the proceedings, the rescission of our

order approving the First Amended Plan and for securing a more favorable allocation for the Class A stockholders.

"Under all the circumstances, including the duplication factor referred to above which is also applicable to the services of this claimant, we are of the opinion that a fee of $15,000 will adequately compensate these attorneys for their services."

 The only factor mentioned by the Commission as motivating it in reducing this fee to $15,000 was the "duplication" factor. Undoubtedly as indicated heretofore, the duplication factor is an important circumstance in determining the fees to be allowed when there are several different firms of attorneys representing various holders of the same class of security. But, as indicated heretofore, the duplication in a proceeding of this kind is inevitable and is not necessarily an unmixed evil. It may be doubted that the Commission would have reversed itself on the first amended plan had it not been for the rather persistent and active representation and opposition of the various security holders holding the Class A common stock. Allowances in a proceeding of this kind must meet the standard of just compensation so that attorneys will be willing to participate actively and render a valuable contribution to such a proceeding and await the consummation of the plan before any remuneration is obtained. As to the present applicants, nearly seven years will have elapsed before they have obtained the final payment on the allowance which is to be made to them. Granted that it is difficult to determine just what reduction should be made where there is the duplication factor, and granted also that reasonable minds may well differ as to this problem, nevertheless, the reduction here seems too drastic in light of all the circumstances and does not square with the Court's understanding of just and equitable compensation. The hourly rate which the Commission allowed is upon the basis of about $10 per hour. The observations made by the Court anent the claim of Messrs. Barron, Rice and Rockmore are pertinent here as to the reasons which persuaded the Court in modifying the Commission's finding as to the allowance to be made. My view is that an allowance in the sum of $20,000 is fair and reasonable and the fees of this firm are fixed in that sum.

The only other phase of the objection made by this firm which requires any particular comment pertains to the item of $3,800 which this firm received from Biewend, and which amount the estate reimbursed Biewend by requiring a refund to him from interim fees paid to this firm. In effect, therefore, the $3,800 received by counsel from Biewend was money from the estate, and in order to make up the $15,000 allowed by the Commission's order of April 8, 1952, a $12,500 interim payment having been made, the net amount to this firm in the Commission's amended order of May 15, 1952, was the sum of $2,500. Counsel contend that the Commission erred in requiring them to repay Biewend the $3,800 which he had advanced in three sums: $1,000 in 1946; $1,800 in 1947; and $1,000 in 1948. They contend that they credited these sums to him as a retainer and reflected these sums in their income tax statements for these years. But these moneys were correctly noted in their income tax statements as fees. The mere fact that Biewend may have made a notation in his claim that he advanced these moneys as expenses to the attorneys is not controlling, and as a matter of bookkeeping, the fees received by this firm which the estate paid, or will pay, according to the Commission's findings, are as follows,

$ 1,000 in 1946 (from Biewend)
1,800 in 1947 (from Biewend)
1,000 in 1948 (from Biewend)
8,700 in 1950 ($12,500 was paid to Sullivan & Worcester but $3,800 was ordered to be refunded to Biewend)
2,500 by order of the Commission of April 8, 1952, as modified May 15, 1952
────
$15,000

If it is clearly borne in mind that the fees of this firm received in 1946, 1947 and 1948 from Biewend are moneys which ultimately came out of the estate by reason of the refund to Biewend of such sums, then there should be no confusion in recognizing that the Commission's order with respect to the refund to Biewend in the sum of $3,800 must be approved. It follows from the foregoing that the balance due Sullivan and Worcester for legal services rendered in this proceeding is $7,500.

Standard Gas and Electric Company.

██ Two law firms and a security analyst participated actively in these proceedings in behalf of the Standard Gas and Electric Company. The Commission found that these claimants rendered valuable services and that the amount of $40,000 requested by attorneys Miller, Mack and Fairchild was reasonable and that the payment for the legal services to Guggenheimer and Untermyer should be limited likewise to $40,000, plus reimbursement of their expenses. However, as stated, it was further ordered that these sums should not be paid by the Delaware Company but by Standard itself. It now appears that Standard has paid these sums to the claimants and seeks reimbursement of the amount paid. Primarily the determination of the Commission that Standard should pay the fees for its own counsel was bottomed upon the following premises,

"We think that the claims in question should be satisfied by Standard without any contribution by the Delaware Company. The Act was enacted to rectify various abuses and uneconomic situations resulting from the use of the holding company device in the public utility field. Holding companies were charged with a statutory duty of bringing their systems into compliance with the standards of the Act and we believe that they should bear their own costs incurred in connection with system proceedings for effecting such compliance rather than shift such costs to the subsidiaries. In the present case Standard, though its position as a holding company over the Delaware Company ceased in 1941, was the parent of the Delaware Company when the complexities were created which we found were required to be eliminated under the Act and which the plan was designed to eliminate. Standard was responsible for those complexities and thus for the necessity of these proceedings. Equity demands that its fees and those of counsel representing it or its stockholders should be borne by it alone, and not by the Delaware Company."

In addition, however, it is urged that the Commission's order should be sustained because although Standard held two classes of stock whose interests were adverse, its primary concern was with the share which should be allocated to the holders of Class B stock in the reorganization. Its activities, therefore, were principally directed to the benefit of that class of stock. Its position in this regard was not unlike that of a large unsecured creditor seeking recognition for its claim in a bankruptcy reorganization. Its activity in the reorganization was directed to the benefit of its own claim and any benefit which inured to the estate or any class of creditors was merely incidental to its principal purpose. Standard was itself the class which was benefited by its contribution to the plan. Its activities so far as being compensable in this proceeding must be distinguished from the activities of counsel in behalf of a certain group of security holders and whose activities benefit this entire class and contribute to the plan. The very necessities of such a situation suggest the fairness and equity of having the estate burdened with such expense rather than to impose it upon the small and many individual security holders. Here, however, the benefits which Standard itself received from its efforts strongly suggest that any legal

expense in connection therewith should be borne by it.

In response to the Commission's contention that Standard was responsible for the complexities which brought about the proceedings under 11(e) of the Holding Act, Standard urges that during the years that it was the parent of the Delaware Company, such relationship was in no way in violation of the law, and the Commission's action in "penalizing" it for its past activities is in effect imposing an *ex post facto* penalty on Standard. However, the Court does not find that it is necessary to refer to the many alleged abuses of Standard, which, according to the Commission, milked the Northern States system during the time that Standard was in control. The undeniable fact is that, as a result of this reorganization, Standard emerged therefrom as the largest stockholder of the Minnesota Company. It is elementary that a successful litigant should pay its own counsel.

Standard contends that the Commission's position is inconsistent in that it did authorize the reimbursement to Standard of its advancement to the expense of the Stone & Webster report. But such action by the Commission in authorizing the reimbursement of moneys paid out for the benefit of the estate in no way commits it to the allowance of Standard's attorneys' fees. If there was inconsistency, it redounded to Standard's benefit and it cannot complain.

In light of all the circumstances and in view of the prior relationship between Standard and the Delaware Company, this Court has no doubt that the Commission acted in accordance with sound, equitable principles and legal standards in requiring Standard to pay its own counsel. The objections of Standard are overruled and the Commission's action with respect to its claim for reimbursement is in all things sustained.

An order consistent with the foregoing may be presented, and for the convenience of the parties it is suggested that Mr. Youngquist prepare such proposed order and present it to the Court on ten days' notice to all interested parties.

An exception is reserved to all aggrieved parties.